IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| JOHN TODD, | ) | CV 10-127-M-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| IAN BAKER; CHAD ZIMMERMAN; | ) | |
| CITY OF KALISPELL; CITY OF | ) | |
| KALISPELL POLICE DEPARTMENT; | ) | |
| KALISPELL POLICE CHIEF ROGER | ) | |
| NASSET; and DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

On November 13, 2007, Plaintiff John Todd was tased by Officer Baker

during a chase.  The taser incapacitated him and he fell to the sidewalk, striking

his head.  He now raises constitutional and tort claims against the City of

Kalispell, the Kalispell Police Department, and Police Chief Roger Nasset

(collectively "the City"), as well as the officers involved in the incident, Ian Baker

and Chad Zimmerman ("the Individual Defendants").

Defendants' four motions in limine are before the Court. The City seeks to limit the testimony of Plaintiff's expert witness Margot Luckman. (Doc. 36.) The Individual Defendants seek to exclude or limit the testimony of Plaintiff's expert witness Dr. Gregory Hipskind (doc. 38) and the testimony of Plaintiff's liability expert, D.P. Van Blaricom (doc. 40). They also seek to exclude evidence regarding prior bad acts, whether Todd in fact possessed marijuana, and insurance and indemnification. (Doc. 42.) Though the Individual Defendants have been dismissed from this action, their arguments are pertinent to the City's defense and are thus addressed below. The various motions are granted in part and denied in part as set forth below.

## ANALYSIS

The Court has wide discretion when determining motions in limine. *Trichtler v. Co. of Lake*, 358 F.3d 1150, 1155 (9th Cir. 2004). Irrelevant evidence is inadmissible, but relevant evidence is generally admissible. Fed. R. Evid. 402.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the

testimony is the produce of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The trial court acts as the "gatekeeper" in making this determination.  Fed. R. Evid. 104(a).  It considers whether the underlying methodology has been tested, whether it has been subjected to publication and peer review, whether the technique is standardized or regulated, its known or potential rate of error, and whether it is generally accepted in the scientific community.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–94 (1993).  The party seeking to admit an expert's testimony does not have to prove that the testimony is scientifically correct, but must show by a preponderance of the evidence that it is reliable and helpful to the trier of fact.  *Id.* at 592 n. 10.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.* at 596.

## A.    Plaintiff's Expert Witness Margot Luckman

The City has moved to exclude certain evidence, testimony, or opinions that may be offered by expert witness Margot Luckman, a certified rehabilitation counsel and licensed professional counsel, concerning Todd's injury and its effects.  Specifically, the City contends Luckman may not testify that: 1) Todd has a traumatic brain injury; 2) Todd will require household maintenance assistance;

3) Todd should enroll in the Bridges program; and 4) Todd will not continue to improve from any injuries he suffered or a patient with a traumatic brain injury is done improving three years after the date of injury.  (Doc. 37 at 2.)

The parties appear to agree on all the issues presented, though the motion was opposed.  Todd concedes in his response brief that Luckman is not qualified to diagnose traumatic brain injury.  (Doc. 46 at 2–3.)  He also concedes that because she relied on Dr. Rosen's opinions, her opinions must conform to his updated opinions as expressed in his deposition.  (*Id.* at 3.)  Finally, he concedes that she must defer in this case to Dr. Rosen's opinions regarding the likelihood that Todd's condition will improve or decline.  (*Id.* at 4.)  However, Todd emphasizes that Luckman is entitled to rely on the diagnoses of other health care providers as the basis for her own opinions, and that she may testify as to the basis of her opinions.  (*Id.* at 1.)  The City agrees.  (Doc. 52 at 2.)

Accordingly, the City's motion (doc. 36) is granted.  Luckman may testify as to the basis of her opinions, but she may not opine whether Todd actually suffered a traumatic brain injury, and she must defer to the updated opinions of the medical providers upon whom she relied in forming her own opinions.

## B.    Plaintiff's Expert Witness Gregory Hipskind, M.D.

The Individual Defendants move to exclude the testimony of Dr. Gregory Hipskind regarding the results of a Single Photon Emission Computed

Tomography ("SPECT") scan of Todd's brain.  Their motion is denied; the evidence is "shaky but admissible" and thus may be explored on cross-examination.  *Daubert*, 509 U.S. at 596.

Todd and his attorneys ordered the SPECT scan at issue after two of Todd's treating physicians, Dr. Rosen and Dr. Patrick Burns, declined to do so because they do not believe the scans are useful for diagnosing or treating brain injuries. The scan was conducted in Denver, Colorado, by a company called CereScan. CereScan transmitted the scans and a three-paragraph "Patient History" to Dr. Hipskind to evaluate.  Dr. Hipskind concluded that there was abnormally low blood flow in the cortical and subcortical areas of Todd's brain.  He further concluded that "[t]he nature, overall pattern and location of these abnormalities is most consistent with traumatic brain injury. . . ."  (Doc. 39-1 at 3.)

### 1.  Diagnosis and causation

The Individual Defendants argue that Dr. Hipskind should not be permitted to testify that Todd has a traumatic brain injury or speculate as to the cause of Todd's abnormalities because the information he is relying on is inadequate or unreliable.

At his deposition, Dr. Hipskind testified that a SPECT scan is not a stand-alone diagnostic tool.  (Dep. Dr. S. Gregory Hipskind, 14:10–15:3 (Dec. 7, 2011), doc. 39-2.)  Before rendering a diagnosis, an analyst must consider other clinical

information.  (*Id.*)  Nor can a SPECT scan, on its own, "tell you the cause of a

particular abnormality."  (*Id.* at 15:16-20; 20:13–26:12).  Per his usual practice,

the only information Dr. Hipskind considered besides the scans was the three-

paragraph "Patient History" included at the start of his report.  The "Patient

History" states that Todd received a traumatic brain injury when he was tased and

thereafter suffered a battery of symptoms.  Dr. Hipskind did not meet or

communicate with Todd or review any of his medical records.  He did not speak

with any of Todd's medical providers, family members, friends, or co-workers,

and he did not review any of the deposition transcripts, pleadings, or discovery in

this case.

The "Patient History" was written by a CereScan employee in Colorado and

appears to reflect the history she received directly from Todd.  There is no

indication she reviewed any other records or independently examined or diagnosed

Todd.  The history does not state when Todd had last consumed caffeine, alcohol,

nicotine, marijuana, or over-the counter medications, or whether he had any

mental illnesses, developmental issues, learning disorders, ADHD, depression,

diseases, or infections.  Nor does it mention whether he had ever experienced any

other head trauma besides the tasing incident.  As admitted by Dr. Hipskind, all

these factors can cause abnormal SPECT scan results.

An expert may rely on inadmissible evidence if the facts and data are the

kind that experts in the field rely upon and such reliance is reasonable.  Fed. R.

Evid. 703.  A doctor can reasonably rely on a patient's self-reports, even if the

reports may be inaccurate.  For example, the Seventh Circuit has held:

> Medical professionals reasonably may be expected to rely on self-reported patient histories.  *See Cooper v. Carl A. Nelson & Co.,* 211 F.3d 1008, 1019–21 (7th Cir. 2000).  Such histories provide information upon which physicians may, and at times must, rely in their diagnostic work. Of course, it is certainly possible that self-reported histories may be inaccurate. [The expert] himself said that it was not unusual for patients to misrepresent their histories to him.  In situations in which a medical expert has relied upon a patient's self-reported history and that history is found to be inaccurate, district courts usually should allow those inaccuracies in that history to be explored through cross-examination.

*Walker v. Soo Line R. Co.*, 208 F.3d 581, 586–87 (7th Cir. 2000).

Though the doctor in *Walker* reviewed more information than Dr. Hipskind,

the same reasoning applies here.  The accuracy and adequacy of Todd's "Patient

History," and the reasonableness of relying on a third party to collect the

information, can best be explored on cross-examination and through rebuttal

testimony.  Accordingly, Dr. Hipskind may testify as to his diagnosis of Todd's

injury and its cause based on his analysis of the SPECT scans and reliance on the

"Patient History."  The record shows that cross-examination is most likely going

to raise credibility issues and that, of course, is its primary purpose.

## 2. Consistency with traumatic brain injury

Dr. Hipskind may also testify that Todd's SPECT scans are "most consistent

with" a traumatic brain injury.  The SPECT methodology as applied by Dr.

Hipskind is sufficiently reliable to admit the evidence and permit Defendants'

arguments to be explored on cross-examination.

### a.  Other possible explanations for Todd's SPECT scan results

As noted above, neither Dr. Hipskind nor the CereScan employee who took

down Todd's history made much effort to account for other explanations for the

alleged abnormalities in Todd's SPECT scans.  There is evidence that Todd may

have suffered from ADHD or another learning disorder before the November 13,

2007 incident, that he suffers from anxiety, that he has used alcohol and

marijuana, and that he was taking an anti-anxiety medication, Propranolol, at the

time of the SPECT scan.  As admitted by Dr. Hipskind, each of these factors could

cause abnormal perfusion patterns.

However, Dr. Hipskind also testified that he would expect the patterns

caused by other factors to be different from a pattern caused by a traumatic brain

injury.  (Dep. Hipskind, 12:16–22 (using mental illness as an example); 59:4–24

(using medications and drugs as an example).)  He also stated that "the areas of

involvement in Mr. Todd's case are fairly classic and pretty much right out of the

textbook for a traumatic pattern."  (*Id.* at 47:9–18; *see also* 60:5–61:2 (describing

typical pattern).)  Defendants' own Exhibit F also indicates that "signature"

patterns have been identified for various problems, including moderate-to-severe

head trauma.  (Socy. of Nuclear Med. Brain Imaging Council, *Ethical Clinical Practice of Functional Brain Imaging*, 37 J. of Nuclear Med. 1256, 1256–57, doc. 39-6.)  Because different patterns can be associated with different causes, Dr. Hipskind may opine on whether the patterns he observed in Todd's scans are consistent with traumatic brain injury.  Defendants can explore the reliability of that conclusion on cross-examination and the jury will resolve the issue.

### b.  Reliability of the database on "normal" perfusion

Defendants also challenge the reliability of the "normal" database used by Dr. Hipskind for comparison.  They do not dispute Dr. Hipskind's assertions that the Segami database was compiled in the 1990s by Dr. Ismael Mena, that it consists of 68 control subjects who were screened for pre-existing mental illness, substance abuse, trauma, and infection, and that studies based on the control group have been published in peer-reviewed scientific journals.  The database is categorized by age, and Todd was compared only to the approximately 20 individuals between the ages of 18 and 45.  But Defendants argue that the database fails to control for variables such as sex, single-handedness, education level, socio-economic status, and ethnic or cultural background.

While a larger control group with more data may be helpful and make comparison results less vulnerable to challenge, Defendants have not shown that the Segami database is inherently unreliable or that it results in inaccurate

comparisons.  Nor have they offered evidence that other variables such as sex, single-handedness, education level, socio-economic status, and ethnic or cultural background affect blood perfusion in the brain.  The database has been used before, studies based on the database have been subject to peer review, and the control subjects were screened for factors that are known to cause blood perfusion abnormalities.  Accordingly, the preponderance of the evidence suggests the database is adequate here.

### c.  The SPECT scan's "cartoon" image of blood perfusion data

Defendants challenge the SPECT scan images comparing Todd to the control group on the grounds that they are not precise, they are not "pictures" of Todd's brain, and they are just a colorful "gimmick" to show the jury.  That of course is argument.

A SPECT scan image comparing a patient to a control group is a visual representation of data from a patient's SPECT scan superimposed on data from the control group.  (Dep. Hipskind 62:4–65:6.)  The data from the control group is averaged, and software creates a derivative image of a brain that is displayed in greys.  (*Id.*)  Where the patient's data deviates from the control group average, it displays in bright colors.  (*Id.*)  Thus, these images are not pictures of any one person's brain and are not very precise.  (*Id.*)

SPECT images can also be misleading.  Some "data warping" may result

because the computer program is unable to correctly map the patient's brain on to the "average" brain.  (Rpt. of Defs.' Expert Dr. Alan Waxman, Exhibit H, doc. 39-8 at 6.)  Additionally, the analyst can set the default color settings to "emphasize subtle abnormalities," as Dr. Hipskind did here, and can select the level of deviation that will display as "abnormal."  (Dep. Hipskind 67:12–70:17.) Defendants' expert Dr. Waxman argues that Dr. Hipskind applies such a high threshold that "abnormalities" will be seen in most normal subjects.  (Rep. Waxman, doc. 39-8 at 13.)   Again, there may be room for argument to the jury, but not enough to preclude the evidence.

Though the images may simplify and even distort a complex picture, the evidence does not support their exclusion.  Dr. Hipskind testified that the images serve "as secondary support to validate [that the comparison is] similar in pattern and location to what you saw on your original scanned data" and they are a "secondary way to look at the data."  (Dep. Hipskind 67:12–70:17.)  Like a graph or a pie chart, or any summary or compilation of information, these images make the data more comprehensible to a layperson, if less precise.  They are probative of any differences in blood perfusion between Todd's brain and a typical brain and will help the jury understand Dr. Hispkind's testimony.  Competent cross-examination can adequately identify the weaknesses of the images and the evidence.

### d.  General acceptance of SPECT scan methodology

Defendants are adamant that SPECT imaging is not generally accepted as a tool for diagnosing or treating mild head trauma.  They note that the American Academy of Neurology and the Society of Nuclear Medicine consider SPECT imaging an investigational tool for the study of mild head injury, not a diagnostic or evaluative tool for the treatment of patients.  They also point out that Todd's own doctors refused to order SPECT scans because they do not find them helpful in diagnosing or treating head trauma.

Regardless of whether SPECT scans are generally used in treatment settings, there is sufficient evidence to permit the jury to consider Dr. Hipskind's testimony here.  SPECT scans appear least reliable when a head injury is mild; the severity of Todd's alleged injury is unclear.  The study cited by Todd suggests that SPECT scans can reveal abnormalities associated with head trauma and that abnormalities are more likely to appear if a patient has received multiple or more severe injuries.  (*See* Jeffrey David Lewine, et al., *Objective Documentation of Traumatic Brain Injury Subsequent to Mild Head Trauma: Multimodal Brain Imaging with MEG, SPECT, and MRI, SPECT*, 22:3 J. of Head Trauma Rehab.141, 141–42, 146, 148, doc. 54-1.)  Todd's own doctors had already evaluated Todd's injury and deficits based on other information; they did not need a SPECT scan to diagnose or treat Todd.  But a jury could reasonably find that

SPECT scan results are helpful to them in weighing evidence that physical anomalies are present that are consistent with head trauma.  There is sufficient evidence to permit a jury to consider the evidence and determine what weight to give it.

### e.  Subjective interpretation of SPECT scans

Defendants also insist that SPECT scans are unreliable because their interpretation is subjective.  They note that Dr. Waxman reviewed the same scans as Dr. Hipskind and concluded that they are normal.  They also cite a 2001 study that demonstrated significant variation in the interpretation of SPECT scans by experienced, board-certified specialists.  (H.L. Stockbridge, et al., *Brain SPECT: A controlled, blinded assessment of intra-reader and inter-reader agreement*, 23 Nuclear Med. Communs. 537–44 (2002), doc. 39-7.)  The variation differed by anatomical region; there was 96–98% agreement in assessing the basal ganglia and 29–81% agreement in assessing the parietal area.  (*Id.* at 540.) The study also found more agreement between readers who worked closely in the same institution than between readers who worked at different institutions.  (*Id.* at 542.)  This finding supports Dr. Hipskind's testimony that he and a Dr. Henderson, whom he had trained, agreed more than 95% of the time in their interpretation of 500 brain scans.  (Dep. Hipskind, 78:9–79:22.)

Though interpreting SPECT scans is a relatively subjective enterprise, it

does not make SPECT scans inherently unreliable.  The study on inter-reader agreement also noted that "[s]ignificant observer variation has been observed in many commonly used radiological, pathological, nuclear medicine, physical examination, and electrophysiologica1 tests[,]" including pulmonary angiography, cervical Papicanolau smears, and mammograms.  (Stockbridge, 543, doc. 39-7.) Such evaluative tools are, nonetheless, sufficiently reliable to be admitted in court. Additionally, the study noted that the readers agreed with their own initial scoring of individual lesions in 65–96% of second readings, suggesting each reader at least demonstrates some internal consistency.  (*Id.* at 540.)  The weaknesses of SPECT scan interpretation may be explored on cross-examination, but the evidence is reliable enough to be admitted.

Accordingly, Defendants' motion to exclude Dr. Hipskind's testimony is denied.

## C.    Plaintiff's Liability Expert, D.P. Van Blaricom

The Individual Defendants also move to exclude the evidence, testimony, or opinions of Todd's liability expert, D.P. Van Blaricom.  Specifically, they seek to exclude his reports, dated August 31, 2011, and amended October 6, 2011.  (Doc. 40 at 2.)   They also seek to exclude any testimony or evidence concerning:

1. Whether Plaintiff was the subject of excessive, unnecessary, and/or grossly unreasonable force through the use of a Taser;

2. Whether Zimmerman's supervision of Baker was deliberately indifferent

or caused a violation of Plaintiff s federal rights;

3. Whether adequate cause existed to seize Plaintiff and whether probable cause existed to charge Plaintiff with possession of dangerous drugs;

4. Whether Police Chief Nasset ratified the tasing of Plaintiff;

5. Whether the Kalispell Police Department was aware that the use of a Taser was unwarranted and injurious;

6. Whether the Kalispell Police Department's review of the tasing incident was inadequate; and

7. Whether the Kalispell Police Department's use of force policy relating to the use of Tasers was inadequate.

(*Id.*)  Finally, they seek to exclude Mr. Van Blaricom's rebuttal to the opinions and testimony of Defendants' liability expert, Police Chief Mark Muir.

Given this court's summary judgment determination, issues 2, 3, 4, 5, 6, and 7 are moot.  That leaves only whether the following should be excluded:  Van Blaricom's reports, his opinions regarding whether the force used was excessive, and his rebuttal testimony.

**1.**    **Admissibility of expert report**s

As the parties agree, Van Blaricom's expert reports are hearsay.  Fed. R. Evid. 801.  While experts sometimes may rely on inadmissible evidence, Van Blaricom did not rely on his own reports in forming the opinions he expressed therein.  Accordingly, they are not admissible under Rule 703 to show the basis of his opinion.  Nor are the reports more probative than the testimony of Van

Blaricom would be, and Todd has not shown that Van Blaricom is unavailable to testify.  Fed. R. Evid. 807(a)(3).  Accordingly, Van Blaricom's reports are inadmissible.   What is contained in the reports may be admissible if the requirements of the Federal Rules of Evidence are met.

> **2.    Opinions regarding whether the force used was excessive under the Montana Constitution**

The officers were entitled to use some force to effectuate a Terry stop when Todd began to flee.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  However, there is a genuine dispute whether the amount of force employed was reasonable considering that Baker did not warn Todd he was going to tase him and the officers did not clearly identify themselves.  While Van Blaricom may not testify as to issues already decided, he may offer his opinion on whether Baker's use of the taser here was reasonable.

Expertise may be based on professional studies or personal experience. *Daubert*, 509 U.S. at 152.  Van Blaricom's expertise is based on a combination of the two.  (*See* doc. 50-1.)  He was a police officer for twenty-nine years, eleven years of which he served as the Chief of Police of Bellevue, Washington.  (Doc. 41-1.)  For the past twenty-five years, he has been engaged as a police practices consultant (*id.*) and has pursued extensive continuing education in relevant matters including tasers and taser use, use of force, and police liability (doc. 50-1 at 3–4).

Van Blaricom is personally familiar with making "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. 396–97. He has also trained officers on making those decisions and studied police practices and policies concerning use of force decisions.

Van Blaricom did not use a taser when he was an active police officer, did not implement policies on taser use as a police chief or City Council member, is not certified in taser use, and has attended only three seminars on tasers. However, taser use is considered an intermediate use of force and fits within an established continuum. Nothing about the use of the taser in this case would require a technical knowledge specific to the taser. Rather, the reasonableness of the use of force deployed in this particular situation is at issue. Accordingly, Van Blaricom possesses "sufficient specialized knowledge to assist the jurors in deciding" this issue. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

### 3.  Rebuttal to Mr. Muir's Testimony and Opinions

Defendants object to paragraph 14 of Van Blaricom's amended report, in which he responds to the report of Defendants' liability expert, Police Chief Mark Muir. They contend it is an improper attack and comment on Muir's character and testimony. It is not. To the extent Muir testifies regarding the reasonableness of

the use of force in this case, Todd may seek rebuttal testimony from Van Blaricom as to the same issue.  Van Blaricom alludes to two use-of-force cases against the City of Missoula that were brought when Muir was Assistant Chief of Police and Chief of Police.  Evidence concerning these cases is admissible as impeachment evidence under Rule 607 because it goes to Muir's credibility and potential bias. Accordingly, Defendants' motion to strike this paragraph and exclude such rebuttal testimony is denied.

**D.     Alleged Prior Bad Acts, Evidence Todd Was Not in Possession of Dangerous Drugs, and Liability Insurance and Indemnification**

The final motion before the Court is the Individual Defendants' motion seeking to exclude evidence concerning 1) alleged prior bad acts of Baker and Zimmerman, 2) any argument Plaintiff was not in possession of dangerous drugs, and 3) liability insurance and indemnification.

The motion is granted as to the latter two arguments.  A prior order held that the officers had reasonable suspicion to effectuate a Terry stop and probable cause to arrest Todd.  Actual innocence or guilt is immaterial to whether the use of force was reasonable if the officers had cause to use force.  Accordingly, evidence that Todd was not in possession of marijuana when he was seized is irrelevant and inadmissible.  Fed. R. Evid. 402.  Additionally, any evidence or improper suggestion concerning insurance or indemnification by either party is disallowed

under Federal Rule of Evidence 411 and *Larez v. Holcomb*, 16 F.3d 1513, 1518–21 (9th Cir. 1994).

Defendants also seek to exclude evidence regarding alleged prior bad acts by the officers involved in the tasing incident.  Between 2005 and 2008, the Kalispell Police Department investigated ten instances of alleged wrongdoing by Officers Baker and Zimmerman, including three use-of-force complaints.  (Doc. 32 at 11.)  The Department sustained one excessive force complaint against Officer Baker due to his failure to report the use of force as required.  (*Id.*) Officers Baker and Zimmerman were exonerated on the other two excessive force complaints.  (*Id.*)  Officer Zimmerman was also given an oral warning for rudeness and Officer Baker for failure to report.  The remaining complaints were not sustained.  Plaintiffs' liability expert, Van Blaricom, reviewed the Departments' reports on all the complaints and determined that they were not relevant to his analysis because citizen complaints against officers are common and the evidence did not show "a series of excessive force complaints."  (Dep. Van Blaricom, 94:1–16, doc. 43-1.)

At this point, Rule 404(b) would seem to exclude evidence regarding these complaints and incidents.  Plaintiffs assert that "other incidents of allegations of excessive use of force[] and failure to report use of force accurately have at least a 'tendency' to establish the individual officers' motive, intent, [and] absence of

mistake or accident." (Doc. 53 at 3 (referring to Fed. R. Evid. 404(b)(2).) But the question for the jury is whether the use of force was reasonable in this particular instance, "without regard to [the officers'] underlying intent or motivation." *Graham*, 490 U.S. at 397. The jury must only decide whether the officers' judgment was reasonable, not whether they reported the incident accurately later. Nonetheless, the Court reserves ruling on the admissibility of prior bad act evidence. The evidence may become relevant at trial, depending on the testimony that is presented.

## CONCLUSION

For the reasons stated above, the IT IS HEREBY ORDERED as follows:

1. The City's motion to limit the testimony of Margot Luckman (doc. 36) is GRANTED. Luckman may testify as to the basis of her opinions, but she may not opine whether Todd actually suffered a traumatic brain injury, and she must defer to the updated opinions of the medical providers upon whom she relied in forming her own opinions.

2. The Individual Defendants' motion to exclude or limit the testimony of Dr. Gregory Hipskind (doc. 38) is DENIED.

3. The Individual Defendants' motion in limine regarding liability expert D.P. Van Blaricom (doc. 40) is GRANTED in part and DENIED in part. Van Blaricom's expert report is inadmissible hearsay. However, he may offer his

opinion on whether the use of force in this case was reasonable.  Defendants'

motion to strike ¶ 14 of his report or exclude such rebuttal testimony is also denied

under Rule 607, and Defendants' remaining arguments are denied as moot.

4.  The Individual Defendants' final motion in limine (doc. 42) is

GRANTED as to evidence regarding insurance and indemnification and as to

evidence that Todd was not in possession of marijuana.  The court reserves ruling

on Defendants' motion to exclude evidence concerning alleged prior bad acts by

Zimmerman and Baker until the arguments can be evaluated in light of the

evidence presented at trial.

Dated this 4th day of June 2012.


DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT